## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
XIN HE & LIN PAN,                              )
                                        )
                    Plaintiffs,         )
                                        )
        v.                              )    Case Number: 1:07CV1449(PLF)
                                        )
MICHAEL CHERTOFF, Secretary of the      )
United States Department of Homeland    )
Security, et al.,                       )
                    Defendants.         )
_____)

### ERRATA

Defendants Michael Chertoff et al., by and through undersigned counsel, hereby submit a corrected version of Defendants' Motion to Dismiss or In the Alternative to Transfer (Dkt. Entry 24). The pdf that was electronically filed contained only the first page of the document (the motion), instead of the full body of the file which included the memorandum of points and authorities and the exhibits thereto. The corrected version of the motion to dismiss is attached as Exhibit 1 hereto, and the exhibits to that motion are attached as Exhibits 2 through 4 hereto.

Dated December 6, 2007              Respectfully submitted,


        _____/s/ Robin M. Meriweather_____
        ROBIN M. MERIWEATHER, D.C. Bar. # 490114
        Assistant United States Attorney
        555 Fourth St., N.W.
        Washington, D.C.  20530
        Phone: (202) 514-7198  Fax: (202) 514-8780
        Robin.Meriweather2@usdoj.gov

### CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of December, 2007, I caused the foregoing errata to

be filed via the Court's Electronic Case Filing system

                    /s/ Robin M. Meriweather
                    Robin M. Meriweather, DC Bar # 490114

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |
|---|---|
| XIN HE & LIN PAN, | ) |
|  | ) |
| Plaintiffs, | ) |
|  | ) |
| v. | ) Case Number: 1:07CV1449(PLF) |
|  | ) |
| MICHAEL CHERTOFF, Secretary of the | ) |
| United States Department of Homeland | ) |
| Security, et al., | ) |
| Defendants. | ) |

_____

### MOTION TO DISMISS OR TRANSFER

Defendants Michael Chertoff, et al., through undersigned counsel, hereby move for dismissal of the complaint pursuant to Rule 12(b)(1) for lack of jurisdiction or, in the alternative, pursuant to Rule 12(b)(6) for failure to state a claim. In the alternative, Defendants move that the case be transferred to the Northern District of Texas. A proposed order and memorandum of points and authorities are attached hereto.

Dated: December 5, 2007                Respectfully submitted,

                     /s/ Jeffrey Taylor by MJ
                     JEFFREY A. TAYLOR, D.C. BAR # 498610
                     United States Attorney


                     /s/ Rudolph Contreras by MJ
                     RUDOLPH CONTRERAS, D.C. BAR #434122
                     Assistant United States Attorney


                     /s/ Robin M. Meriweather
                     ROBIN M. MERIWEATHER, D.C. Bar. # 490114
                     Assistant United States Attorney
                     555 Fourth St., N.W.
                     Washington, D.C. 20530
                     Phone: (202) 514-7198 Fax: (202) 514-8780
                     Robin.Meriweather2@usdoj.gov

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| XIN HE & LIN PAN, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case Number: 1:07CV1449(PLF) |
| | ) | |
| MICHAEL CHERTOFF, Secretary of the | ) | |
| United States Department of Homeland | ) | |
| Security, <u>et al.</u>, | ) | |
| Defendants. | ) | |
| _____ | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS OR IN THE ALTERNATIVE TO TRANSFER

## <u>INTRODUCTION AND SUMMARY</u>

Congress has expressly withdrawn federal court jurisdiction over the discretionary

judgments, actions, and decisions United States Citizenship and Immigration Services ("USCIS")

makes when reviewing petitions for immigration benefits.  Nonetheless, Plaintiffs Xin He ("He")

and Lin Pan ("Pan") (collectively Plaintiffs) ask this Court to intervene in that process, and order

USCIS to complete its adjudication of a Form I-485 "adjustment of status" application Plaintiffs

filed to seek lawful permanent resident status.  USCIS has not completed its adjudication of

Plaintiffs' I-485 applications because the national security screenings — which the FBI conducts

for all adjustment applicants — are not yet complete.  Recognizing that fact, Plaintiffs also ask

the Court to order the FBI to immediately complete its national security investigations.  However,

there is no statute or regulation requiring the FBI to limit its national security investigations to a

fixed period of time.  Nor has Congress limited the FBI's discretion to determine how and when

to conduct its national security investigations into applicants' background.  It follows that the

1

Court lacks jurisdiction to review those claims, and that Plaintiffs' complaint should be dismissed.

Assuming arguendo that this Court did have subject matter jurisdiction to review Plaintiffs' challenge to the pace of USCIS's adjudication of their I-485s and the FBI's completion of its national security investigations, they would be unable to state a claim for unreasonable agency delay. The D.C. Circuit has identified several factors courts should consider when determining whether an agency has unreasonably delayed final action, two of which are particularly significant here. First, as noted, there is no statutory timetable for adjudicating adjustment applications. Second, USCIS and the FBI have an interest in processing adjustment applications and background checks on a first-in, first-out basis, and in ensuring that lawful permanent residence status is not granted to individuals whose permanent residence in the United States would raise national security concerns. Moreover, the D.C. Circuit has declined to intervene in agency delay cases when "a judicial order putting the petitioner at the head of the queue would simply move all others back one space and produce no net gain." Mashpee Wampanoag Tribal Council, Inc. v. Norton, 336 F.3d 1094, 1100 (D.C. Cir. 2003). Giving Plaintiffs' applications and background checks precedence over others' presents exactly that type of situation.

Finally, Defendants move in the alternative to transfer this case to the United States District Court for the Northern District of Texas. The only nexus between this District and the case is the fact that the agency heads named as defendants have offices in D.C. However, most of the events giving rise to this complaint — namely, the processing and adjudication of Plaintiffs' I-485 — have transpired in the Texas Service Center of USCIS. Accordingly, the Northern District of Texas is a more appropriate forum for this case than this Court, and the interests of justice support transfer.

2

# BACKGROUND

A.    **Statutory and Regulatory Background**

1.    Adjustments of Status and Background Investigations

The Immigration and Nationality Act permits the Attorney General "in his discretion and under such regulations as he may prescribe," to adjust the status of an alien "to that of an alien lawfully admitted for permanent residence."  8 U.S.C. § 1255(a).  Aliens that seek such adjustments of status file applications referred to as an "I-485."  The procedures for admitted aliens to apply for adjustment of status are set forth at 8 C.F.R. part 245.

USCIS processes adjustment applications in chronological order based on the date of receipt.  Neither the statute nor the regulations establish a time frame in which adjudication must occur.  The applicant must show that (s)he is not inadmissible to the United States under any statutory ground of inadmissibility set forth at section 212(a) of the Immigration and Nationality Act, 8 U.S.C. § 1182(a), including health-related, criminal, terrorist, and other grounds.  See 8 U.S.C. § 1255(a)(2).  An alien seeking adjustment of status bears at all times the burden of persuading the Attorney General to exercise his discretion in the alien's favor.  See Randall v. Meese, 854 F.2d 472, 474 (D.C. Cir. 1988); Jain v. Immigration and Naturalization Service, 612 F.2d 683, 687 (2d Cir. 1979); see generally Elkins v. Moreno, 435 U.S. 647, 667 (1978) ("... adjustment of status is a matter of grace, not right ...").

Before a decision is rendered on an alien's I-485 application for adjustment of status, USCIS requests that the FBI conduct a national security screening.   See Declaration of Genize Walker, ¶¶ 5,6 (Exh. 1) ("Walker Decl.").  These checks currently include: (a) an FBI fingerprint check; (b) a check against the Interagency Border Inspection System (IBIS), which is managed by the Department of Homeland Security and contains records and "watch list" information from

more than twenty law enforcement and intelligence agencies; and (c) an FBI name check.  <u>Id.</u> ¶ 14; <u>see</u> <u>also</u> 8 U.S.C. § 1105(a) (authorizing "direct and continuous liaison" with the Directors of the FBI and CIA to obtain and exchange information for use in enforcing the INA and in the interest of the internal and border security of the United States).

These security checks sometimes raise significant derogatory information which affect an applicant's eligibility for an immigration benefit.  <u>See</u> Walker Decl. ¶ 15.  In those cases, USCIS must conduct further inquiry to resolve any outstanding issues, and in some cases may initiate proceedings to remove the alien from the United States.  <u>Id.</u> ¶ 15.  USCIS cannot complete its adjudication of a request for permanent residence until all security checks have been completed, and until any and all issues that arise from those checks have been resolved.  <u>Id.</u> ¶ 16.

Because of heightened national security concerns, a review of the background check procedures employed by USCIS was conducted in November 2002.  <u>See</u> Decl. of Michael A. Cannon, ¶ 23 (Exh. 2) ("Cannon Decl.").  It was determined that more detailed, in-depth clearance procedures were required in order to better protect the people and the interests of the United States.  <u>See</u> <u>id.</u>  The name check clearance performed by the FBI was one of the procedures that needed revision.  <u>See</u> <u>id.</u>  Prior to November 2002, only those "main" files that could be positively identified with an individual were considered responsive.  <u>See</u> <u>id.</u>  The FBI subsequently altered its search criteria because the risk of missing a match to possible derogatory record(s) was too great.  <u>See</u> <u>id.</u>  Therefore, the search criteria were expanded to access reference files in addition to the main files.  <u>See</u> <u>id.</u>  From a processing standpoint, this change meant the FBI would have to review many more files for each individual.  <u>See</u> <u>id.</u>

In December 2002 and January 2003, USCIS resubmitted 2.7 million name check requests to the FBI in addition to the regular submissions.  <u>See</u> <u>id.</u> ¶ 24.  Over 440,000 of the responses to

4

the 2.7 million resubmitted name check requests indicated that the FBI may have information relating to the subjects. See id. The FBI's processing of the more than 440,000 resubmissions that require follow-up to resolve the name checks has delayed the processing of the regular submissions from USCIS, although fewer than 6,300 of those re-submitted name check requests remain pending. See id. ¶ 25. Several other factors contribute to potential delays in processing background checks for an applicant, including the volume of incoming name check requests, the number of hits on a name when it is reviewed, the processing of common names, and the accessibility of the FBI records needed for review. See id. ¶ 29. The FBI generally processes name check requests on a first-in, first-out basis (unless USCIS specifically requests that a particular name check be expedited or the name checks have been prioritized as "single hit" name checks). See id. ¶¶ 18-20.

2.    Judicial Review of Immigration-Related Decisions

In 1996, Congress passed legislation to reduce, and in some cases eliminate, judicial review of certain immigration-related decisions made by the former Immigration and Naturalization Service ("INS"). See Sec. 306, Illegal Immigration Reform and Immigration Responsibility Act of 1996 (IIRIRA), Pub. L. 104-208, 110 Stat. 3009 (September 30, 1996). In particular, 8 U.S.C. § 1252(a)(2)(B)(ii), divests courts of jurisdiction to review any "decision or action of the Attorney General the authority for which is specified … to be in the discretion of the Attorney General, other than the granting of [asylum]."

Because some courts, contrary to Congress' desires, found that this jurisdiction-stripping bar applied only to discretionary decisions made during removal (deportation) proceedings, on May 11, 2005, Congress amended Section 1252(a)(2)(B)(ii) to clarify that its proscription against judicial review applies regardless of whether the discretionary judgment, decision or action is

5

made in removal proceedings.  See Section 101(f), Real ID Act of 2005, Pub. L. 109-13, Div. B,

119 Stat. 231; see also House Conference Report 109-72 at 170 (May 3, 2005).  The REAL ID

Act also added references to the Secretary of Homeland Security consistent with the

reorganization of INS (under the Attorney General and U.S. Department of Justice) into USCIS

(under the Department of Homeland Security).  Id.  After passage of the Real ID Act, the statute

reads as follows:

> (B) Denials of discretionary relief
>
> Notwithstanding any other provision of law (statutory or nonstatutory) . . .
> and regardless of whether the judgment, decision, or action is made in removal
> proceedings, no court shall have jurisdiction to review–
> > (i) any judgment regarding the granting of relief under section 1182(h),
> > 1182(I), 1229b, 1229c, or 1255 of this title, or
> > (ii) any other decision or action of the Attorney General or the Secretary of
> > Homeland Security the authority for which is specified under this
> > subchapter to be in the discretion of the Attorney General or the Secretary
> > of Homeland Security, other than the granting of relief under section
> > 1158(a) of this title.

8 U.S.C. 1252(a)(2)(B).

**B.    Plaintiffs' Applications**

Plaintiff Xin He, a native and citizen of China, filed a Form I-485 application to register

permanent residence or adjust status on June 19, 2003.  See Compl. ¶ 21.  His spouse, Plaintiff

Lin Pan, filed a derivative form I-485 application on the same day.  See id.  Those applications

were filed with United States Citizenship and Immigration Service's ("USCIS") Vermont Service

Center, which then transferred the application to the USCIS Texas Service Center ("TSC" or

"Texas Service Center").  See id. ¶ 21.  The TSC currently maintains the records concerning

Plaintiffs' I-485s, and is the USCIS office that is processing their applications.  See Walker Decl.,

¶.  The TSC is located in Dallas, Texas.  See Exh. 3 (http://149.101.2.2/graphics/fieldoffices/texas/

6

about us.htm).

Shortly after Plaintiffs' applications for adjustment of status were filed, USCIS requested that the FBI conduct background checks in connection with the I-485s.  <u>See</u> Walker Decl. ¶ 18; Cannon Decl. ¶¶ 41-42.  The background check for He is not yet complete.  <u>See</u> Cannon Decl. ¶ 41.  The background check for Pan is complete, <u>see id.</u> ¶ 42.  However, because Pan's I-485 is a derivative application  — which is adjudicated with the primary application with which it is linked — her application cannot be adjudicated unless and until He's application has been approved.  <u>See</u> Walker Decl. ¶ 19.  The Texas Service Center regularly checks the status of the background checks, but cannot complete its adjudication of the I-485s until it receives the results of those checks.  <u>See id.</u> ¶ 19.  The FBI will transfer the results of the background check to USCIS after the investigation is complete.  <u>See</u> Cannon Decl. ¶ 40.

Plaintiffs initiated this action with a mandamus complaint filed August 10, 2007.  Plaintiffs ask the Court to order Defendants to complete the national security background investigations within thirty days, and to complete adjudication of their I-485 applications within thirty days after receiving the results of the investigation.  Compl. at 10-11.

## STANDARD OF REVIEW

Defendants move for dismissal under Rule 12(b)(1) because the Court lacks subject matter jurisdiction to review Plaintiffs' claims.  <u>See</u> Fed. R. Civ. P. 12(b)(1).  When reviewing a 12(b)(1) motion to dismiss, "the court must accept the complaint's well-pled factual allegations as true and draw all reasonable inferences in the plaintiff's favor."  <u>Thompson v. Capitol Police Bd.</u>, 120 F. Supp.2d 78, 81 (D.D.C. 2000) (citations omitted); <u>see also</u> <u>Vanover v. Hantman</u>, 77 F. Supp.2d 91, 98 (D.D.C. 1999).  "The court is not required, however, to accept inferences unsupported by the facts alleged or legal conclusions that are cast as factual allegations."  <u>Rann v. Chao</u>, 154 F.

7

Supp. 2d 61, 64 (D.D.C. 2001), aff'd, 346 F.3d 192 (D.C. Cir. 2003).  In addition, plaintiffs bear

the burden of persuasion, and must establish subject-matter jurisdiction "by a preponderance of

the evidence."  Thompson, 120 F. Supp.2d at 81; Vanover, 77 F. Supp.2d at 98.  To determine the

existence of jurisdiction, a court may look beyond the allegations of the complaint, consider

affidavits and other extrinsic information, and ultimately weigh the conflicting evidence.  See

Herbert v. Nat'l Academy of Sciences, 974 F.2d 192, 197 (D.C. Cir. 1992); Rann, 154 F. Supp. at

64.

         Defendants also move for dismissal under Rule 12(b)(6), for failure to state a claim upon

which relief can be granted.  Rule 12(b)(6) requires dismissal if a plaintiff fails to plead "enough

facts to state a claim for relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 127 S.Ct.

1955, 1974 (2007) (abrogating prior standard which required the moving party to show that

plaintiff can prove no set of facts in support of its claim which would entitle it to relief).  The

Court must resolve all factual doubts in favor of the plaintiff, and allow the plaintiff the benefit of

all inferences.  See EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir.

1997).

## ARGUMENT

### I.    THE COURT LACKS SUBJECT MATTER JURISDICTION TO REVIEW PLAINTIFFS' CLAIMS.

         "Federal courts are courts of limited jurisdiction . . . [and] possess only that power

authorized by Constitution and statute."  Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375, 377

(1994); see also Shaffer v. Veneman, 325 F.3d 370, 372 (D.C. Cir. 2003) (noting that district

courts "have only such jurisdiction as the Constitution and the Congress grant them").  The

statutes cited in the complaint do not establish a statutory basis for the Court to exercise

jurisdiction over this case.  The Court lacks jurisdiction to review Plaintiffs' challenge to USCIS's

processing of their I-485 applications because Section 1252 of the INA precludes judicial review

of USCIS's "judgments" on applications for adjustment of status, and of numerous other

discretionary decisions and actions involving immigration-related applications and proceedings.

8 U.S.C. § 1252(a)(2)(B).  That provision applies "notwithstanding any other provision of law,"

thereby trumping any alternative source of jurisdiction.  Id.  The FBI has complete discretion to

determine the scope and pace of its national security investigations.  Accordingly neither the

Administrative Procedures Act ("APA") nor the Mandamus Act permits this Court to review that

discretionary process.  USCIS has equally broad discretion to determine the pace and manner of

adjudicating adjustment of status applications.  Accordingly, there would be no APA or

mandamus jurisdiction over Plaintiff's challenge to that process even if the INA did not preempt

other sources of jurisdiction.

### A.    8 U.S.C. § 1252(a)(2)(B) Divests This Court of Jurisdiction Over Plaintiffs' Challenge to USCIS's Adjudication of Their I-485 Applications.

Section 1252(a) of the INA expressly precludes judicial review of adjustment of status

applications and other discretionary decisions.  As noted supra, Section 1252(a)(2)(B), provides

that "no court shall have jurisdiction to review:"

> (i)    any judgment regarding the granting of relief under section 1182(h), 1182(i), 1229b, 1229c, or 1255 of this title, or
> (ii)    any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this title to be in the discretion of the Attorney General or the Secretary of Homeland Security, . . . .

8 U.S.C. § 1252(a)(2)(B) (emphasis added).  In seeking to compel the adjudication of an

adjustment of status application under 8 U.S.C. § 1255, Plaintiffs' claims fall squarely within the

plain meaning of each of these terms.

First, the authority to adjudicate adjustment of status applications arises under 8 U.S.C. § 1255(a), and subsection (i) expressly bars judicial review of "any judgment regarding the granting" of such an application.  8 U.S.C. §§ 1252(a)(2)(B)(i), 1255(a).  It follows that the Court cannot review USCIS's judgment that its adjudication of Plaintiffs' application cannot be completed until the FBI has completed processing the background checks.

Second, Section 1252(a)(2)(B)(ii) also divests this Court of subject matter jurisdiction over Plaintiffs' claims because the adjudication of an adjustment of status application is a discretionary action and decision.  "[T]his subchapter" refers to Subchapter II of Chapter 12 of Title 8 of the U.S. Code, which is composed of 8 U.S.C. §§ 1151 through 1378.  Section 1255(a), which grants the Attorney General discretionary authority to adjudicate adjustment of status applications, is thus part of Subchapter II.  The "authority" for adjudicating adjustment of status applications is expressly "in the discretion of the Attorney General," pursuant to Section 1255(a).  See 8 U.S.C. § 1255(a) (providing that an alien's status "*may* be adjusted by the Attorney General, *in his discretion* and under such regulations as he may prescribe." Id. (emphasis added)).  The statute provides no time frame for the adjudication of I-485 applications, and gives the Attorney General complete discretion to prescribe any appropriate regulations.  See id.  The Attorney General's discretion over the process of adjudicating an I-485 application necessarily extends to the assessment of when, whether, and how to grant an adjustment application.  That statutory language has led numerous courts to conclude that Section 1252(a)(2)(B)(ii) bars judicial review of claims challenging aspects of the I-485 adjudicative process.  See, e.g., "); Luo v. Keisler, ___ F. Supp. 2d ____, 2007 WL 3357241 (D.D.C. Nov. 14, 2007) (discussing Section 1252(a)(2)(B) and granting motion to dismiss action to compel adjudication of plaintiffs' I-485s); Grinberg v. Swacina, 2007 WL 840109 (S.D.Fla. March 20, 2007) (discussing Section

1252(a)(2)(B) and granting motion to dismiss); <u>Safadi v. Howard</u>, 466 F. Supp. 2d 696 (E.D. Va. 2006) (same); <u>Sharkey v. Ganter</u>, 2006 WL 177156 (S.D.N.Y.)(same); <u>Dinsey v. Department of Homeland Security</u>, No. 03-10081, 2004 WL 1698630, at * 4 (S.D.N.Y. 2004) (finding no jurisdiction over action to compel USCIS to adjudicate adjustment of status application because the INA "expressly places the adjustment of immigration status within the discretion of the Attorney General); <u>see generally</u> <u>Zhu v. Gonzales</u>, 411 F.3d 292, 294-96 (D.C. Cir. 2005) (concluding 1252(a) precludes judicial review of Attorney General's discretionary decision to require party to obtain labor certification prior to obtaining a work visa); <u>Mahaveer, Inc. v. Bushey</u>, No. 04-1275, 2006 WL 1716723, at *3-*4 (D.D.C. June 19, 2006) (concluding 1252(a) bars review of discretionary denial of visa).

  Defendants recognize that federal district courts are split on this issue, and that some judges have concluded that they have jurisdiction to review the reasonableness of any delays in completing adjudication of an I-485 petition. <u>Compare, e.g.</u>, <u>Liu v. Novak</u>, No. 07-263, ___ F. Supp. 2d ___, 2007 WL 2460425 (D.D.C. Aug. 30, 2007) (exercising jurisdiction over claim alleging unreasonable delay in resolving adjustment of status application); <u>Alsharqawi v. Gonzales</u>, No. 06-1165, 2007 WL 1346667 (N.D. Tex. Mar. 14, 2007) (same) <u>with</u> <u>Luo</u>, 2007 WL 3357241, at *1-*2 (dismissing claim alleging unreasonable delay in resolving adjustment of status application for lack of jurisdiction); <u>Elzer v. Mueller</u>, No. 07-01666, 2007 WL 1221195 (E.D. Pa. Apr. 23, 2007) (dismissing challenge for lack or jurisdiction); <u>Grinberg</u>, 478 F. Supp. 2d at 1352 (same). However, the D.C. Circuit has not yet addressed the issue, and the other courts' rulings are not binding on this Court. As the foregoing discussion makes clear, the INA's jurisdiction-stripping provisions are best read as precluding judicial review of Plaintiff's claims concerning the adjustment of status application. "[T]he Court's insertion into [the I-485 adjudication]

11

process would be inappropriate and could be detrimental to national security." <u>Luo</u>,  2007 WL

3357241, at *2.

**B.    <u>No Other Statute Gives the Court Jurisdiction to Review Plaintiffs' Challenge to the Pace of the Adjudication of Their I-485 Applications or the FBI's National Security Investigations</u>.**

Even if some other statute conferred jurisdiction to review Plaintiffs' request for

immediate adjudication of their adjustment of status applications, the INA would foreclose the

exercise of that jurisdiction because it applies "notwithstanding any other provision of law

(statutory or nonstatutory)." 8 U.S.C. § 1252(a)(2)(A);  <u>see Luo</u>, 2007 WL 3357241, at * 2 n. 4

(citing INA and noting that it specifically precludes judicial review "notwithstanding any other

provision of law"); <u>Danilov v. Aguirre</u>, 370 F. Supp. 2d 441, 445 (E.D. Va. 2005) (Ellis, J.) ("[I]t

is well settled that general grants of jurisdiction may not be relied upon to expand a very specific

statute that either grants or limits jurisdiction.").  However there is no alternative source of

jurisdiction in this case.  The Mandamus Act does not apply because the process of adjudicating

Plaintiff's application involves discretionary acts and decisions.  The Administrative Procedure

Act is inapplicable for similar reasons.  The FBI has plenary discretion over the terms on which

its national security investigations are conducted.  Accordingly, neither the Mandamus Act nor

the APA empowers this Court to compel the FBI to complete its investigation of Plaintiff's

background within 30 days or any specific period of time.

**1.    <u>The Mandamus Act Does Not Confer Jurisdiction Because The Adjudication of Adjustment of Status Applications and the FBI's Completion of National Security Investigations Are Discretionary</u>.**

The Mandamus Act would not confer subject matter jurisdiction even if the jurisdiction-

stripping provisions of INA § 242 did not apply.  That statute gives district courts "original

jurisdiction of any action in the nature of mandamus to compel an officer or employee of the

United States or any agency thereof to perform a duty owed to the plaintiff."  28 U.S.C. § 1361.

The writ of mandamus is "a drastic and extraordinary remedy reserved for really extraordinary

causes."  Cheney v. United States District Court, 542 U.S. 367, 380 (2004) (internal quotations

and citation omitted); accord Allied Chemical Corp. v. Daiflon, Inc., 449 U.S. 33, 34 (1980).

District courts may issue a writ of mandamus only if three elements are met: "(1) the plaintiff has

a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate

remedy available to the plaintiff."  In re Medicare Reimbursement Litigation, 414 F.3d 7, 10

(D.C. Cir. 2005); see also Heckler v. Ringer, 466 U.S. 602, 616 (1984) (noting that defendant

must owe plaintiff "a clear nondiscretionary duty" and that all other remedies must be exhausted).

Even when those factors are present, "a court may grant relief only when it finds 'compelling

equitable grounds.'"  In re Medicare Reimbursement Litigation, 414 F.3d at 10.

Here, Plaintiffs lack a clear right to immediate adjudication or immediate completion of

He's background investigation, and Defendants have no clear mandatory or ministerial obligation

to adjudicate the applications or complete background checks within a particular time frame.  See

Luo, 2007 WL 3357241, at *2 n.4; Safadi v. Howard, 466 F.Supp.2d at 700; Grinberg, 478 F.

Supp. 2d at 1354.  The decision whether to grant or deny Plaintiffs' adjustment applications is

plainly discretionary by statute.  See 8 U.S.C. § 1255(a).  Surely, that discretion permits USCIS to

enforce a background check requirement thereby ensuring that immigration benefits are not

granted to an alien ineligible for the benefit due to fraud, criminal convictions, or national security

matters.  There are no statutory provisions or regulations that mandate the adjudication of

adjustment applications within a particular time frame.  Consequently, USCIS has no clear,

mandatory duty to finish adjudicating Plaintiffs' application prior to completion of background

checks, or by a prescribed deadline. Likewise, Plaintiffs can point to no clear and indisputable

right to have the background checks completed within a specific time frame, and the FBI has no

statutory or regulatory duty to limit background examinations to a fixed period of time.  See

Shalabi v. Gonzales, No. 06-866, 2006 WL 3032413, at * 5 (E.D. Mo. Oct. 23, 2006) (denying

plaintiff's request that the court compel that plaintiff's background check be expedited).  Those

factors have led numerous district courts to find that mandamus relief is unavailable in cases such

as this.  See, e.g., Li, 482 F. Supp. 2d at 1177; Grinberg, 478 F. Supp. 2d at 1354; Safadi, 466 F.

Supp.2d at 700; Saleh v. Ridge, 367 F. Supp.2d 508, 511 (S.D.N.Y. 2005); Karan v. McElroy,

No. 02 Civ. 6678 (JGK), 2003 WL 21209769, at *1 (S.D.N.Y. May 23, 2003); Zheng v. Reno,

166 F. Supp.2d 875, 880-81 (S.D.N.Y. 2001); Sadowski v. INS, 107 F.Supp.2d 451, 453

(S.D.N.Y. 2000).  This Court should do the same.

> **2.    The Administrative Procedures Act Does Not Permit This Court to Review Plaintiff's Challenge to USCIS's and the FBI's Processing of Her I-485 and the Mandatory Background Checks.**

Plaintiffs also have no right to judicial review under the APA.  Although the APA is not

an independent source of subject matter jurisdiction, it operates in tandem with federal question

jurisdiction under 28 U.S.C. § 1331 to permit courts to review challenges to certain agency

actions.  See Califano v. Sanders, 430 U.S. 99, 107 (1977); Grinberg, 478 F. Supp. 2d at 1355;

Galluci v. Chao, 374 F. Supp. 2d 121, 128 (D.D.C. 2005).  However, the APA expressly

precludes judicial review of agency actions in two circumstances: (1) if another statute

"preclude[s] judicial review;" and (2) when "agency action is committed to agency discretion by

law."  5 U.S.C. § 701(a)(2); Brock v. Pierce County, 476 U.S. 253, 260 n.7 (1986).  Both factors

prevent Plaintiffs from using the APA as a means of challenging USCIS's processing of their

adjustment applications and/or the FBI's processing of He's background checks.

First, as discussed above, the INA bars judicial review of challenges to the adjustment of

status adjudication process.  Accordingly, Section 701(a) of the APA, which "withdraws [an

APA] cause of action" to the extent another statute "precludes judicial review," prevents Plaintiff

from raising an APA challenge concerning the adjudication of her adjustment of status

application.  Block v. Community Nutrition Inst., 467 U.S. 340, 345 (1984); see 5 U.S.C. §

701(a); Beyond Pesticides v. Whitman, 360 F. Supp. 2d 69, 71 (D.D.C. 2004); see generally

Bruno v. Albright, 197 F.3d 1153, 1161-62 (D.C. Cir. 1999) (concluding that "the immigration

laws preclude judicial review of consular visa decisions" and therefore bar APA challenges to a

visa decision).  Section 702 forecloses judicial review of Plaintiffs' challenge to the adjudication

of her I-485 for the same reason, as it provides that "nothing herein affects other limitations on

judicial review . . . or confers authority to grant relief if any other statute that grants consent to

suit expressly or impliedly forbids the relief which is sought."  5 U.S.C. § 702.

    Second, the APA bars judicial review of all of Plaintiffs' claims because the USCIS and

FBI actions Plaintiff has challenged are discretionary.  The APA generally permits challenges to

"agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1); see also 5

U.S.C. § 555(b) (indicating that agencies should conclude matters "within a reasonable time").

However, such claims are unreviewable by the courts if the relevant agency action is "committed

to agency discretion by law."  Id. § 701(a)(2).  In Heckler v. Chaney, the Supreme Court

interpreted 5 U.S.C. § 701(a)(2) to mean that "review is not to be had if the statute is drawn so

that the court would have no meaningful standard against which to judge the agency's exercise of

discretion."  470 U.S. 821, 830 (1985).  As the Court explained, "if no judicially manageable

standards are available for judging how and when an agency should exercise its discretion, then it

is impossible to evaluate agency action for 'abuse of discretion.'"  Id.; see also Steenholdt v.

Federal Aviation Admin., 314 F.3d 633, (D.C. Cir. 2003) (articulating same standard).  "The

principal purpose of the APA limitations . . . and of the traditional limitations upon mandamus from which they were derived—is to protect agencies from undue judicial interference with their lawful discretion . . . ."  Norton v. So. Utah Wilderness Alliance, 542 U.S. 55, 66 (2004).

Plaintiffs have no APA cause of action for "unreasonable agency delay" against USCIS because the timing of USCIS's adjudication of her adjustment of status application is expressly committed to agency discretion, as are all other aspects of processing that application.  Section 1255(a) permits the Attorney General to adjust an alien's status "*in his discretion* and under such regulations as he may prescribe."  8 U.S.C. § 1255(a) (emphasis added).  That is the type of "plenary" grant of discretion which renders agency actions unreviewable under the APA. Secretary of Labor v. Twentymile Coal Co., 456 F.3d 151, 157 (D.C. Cir. 2006).  No statutory or regulatory provisions provide a "meaningful standard" against which to measure USCIS's process of adjudicating such an application.  Heckler, 470 U.S. at 830.  Rather, the agency maintains complete discretion to determine "how and when" to adjudicate the application.  See id.  In contrast with certain other immigration provisions, e.g., 8 U.S.C. § 1447(b), the statute and regulations governing Plaintiff's adjustment of status application provide no time frame for when such an application must be adjudicated.  See Zheng, 166 F.Supp.2d at 879 ("[T]here is no requirement that the application be decided within a specific period of time[.]").  Consequently, there is no standard against which the Court can measure whether USCIS has acted "within a reasonable time," 5 U.S.C. § 555(b), or "unreasonably delayed" adjudication, id. § 706(1).  The fact that the adjudicatory process is committed to agency discretion by law renders claims relating to alleged delays in the adjudication of an adjustment of status application unreviewable under the APA.  See Luo, 2007 WL 3357241, at *2  n.4; Safadi, 466 F.Supp.2d at 700; Zheng, 166 F.Supp.2d at 878-89; Karan, 2003 WL 21209769, at *1 ("[B]ecause decisions regarding the

16

plaintiff's immigration status are committed to the discretion of the INS, this Court lacks the authority under . . . the APA to grant the relief the plaintiff seeks."); see also Rahman v. McElroy, 884 F.Supp. 782, 787-88 (S.D.N.Y. 1995).   In addition, at least two Supreme Court cases suggest that the presence of a specified time period triggers courts' ability to compel agency action that is "unreasonably delayed" under § 706(1).  See Norton, 542 U.S. at 65 ("Thus, when an agency is compelled by law to act within a certain time period . . . a court can compel the agency to act . . . ."); Brock, 476 U.S. at 260 n.7 (finding that because "the statutory command that the Secretary 'shall' act within 120 days does not commit such action to the Secretary's discretion, . . . [t]he court would have the authority to 'compel agency action unlawfully withheld or unreasonably delayed,' § 706(1)").

The FBI's discretion to conduct its national security investigations bars APA jurisdiction over Plaintiffs' challenge to the pace of that investigation. The FBI has determined that "its mission on homeland security requires that its name check process be primarily focused on providing accurate and thorough results."  Cannon Decl. ¶ 23.  Plaintiffs have cited no statute or regulation constraining the FBI's discretion to determine how and when to conduct its investigations, and Defendants are aware of none.  Instead, courts have recognized that they lack jurisdiction to dictate the terms of FBI background investigations, under the APA or any other statute.  See, e.g., Omar v. Mueller, 501 F. Supp. 2d 636, 640 (D.N.J. 2007) (finding no APA jurisdiction to review 'unreasonable delay' claim concerning FBI's completion of background check for naturalization applicant);  Shalabi, 2006 WL 3032413, at * 5 (concluding court lacked jurisdiction to compel FBI to complete background checks); Sozanski v. Chertoff, 2006 WL 4516968, at *1 (N.D. Tex. Dec. 11, 2006) (finding no APA or Mandamus Act jurisdiction to compel FBI to complete background check).

17

Without any mandatory time frame to adjudicate Plaintiffs' claim that USCIS and the FBI have "unreasonably delayed" adjudication of the applications and the processing of He's background checks, this Court would have to create a temporal standard out of whole cloth. This is a perilous task given the national security considerations that permeate USCIS's adjudicative process and the obvious national security interest in through and complete FBI background checks. It is a well-established proposition that judicial review of immigration matters is narrowly circumscribed, and that control over immigration is largely entrusted to the political branches of the government. See Valenzuela-Bernal, 458 U.S. at 864; . Diaz, 426 U.S. at 81 ("Since decisions in these matters may implicate our relations with foreign powers, and since a wide variety of classifications must be defined in the light of changing political and economic circumstances, such decisions are frequently of a character more appropriate to either the Legislature or the Executive than to the Judiciary."). Moreover, as other courts have cautioned, in "'matters solely within the INS's discretion[,] . . . aside from our powerlessness to intervene, the judicial creation of such a duty would have the potential for mischievous interference with the functioning of already overburdened administrative agencies.'" Rahman, 884 F. Supp. at 787 (quoting Wan Shih Hsieh v. Kiley, 569 F.2d 1179, 1182 (2d Cir. 1978)); see also Heckler, 470 U.S. at 831-82 (noting that "[t]he agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities"); Luo, 2007 WL 3357241, at *2 (concluding judicial intervention would be "inappropriate" given national security concerns). Those principles counsel against the imposition of a judicially-created standard to gauge how long USCIS may wait for assurance that the background checks have identified no national security reasons that would merit denial of an applicant's adjustment application, or how much time the FBI may devote to its investigations.

## II.    IF THE COURT HAD SUBJECT MATTER JURISDICTION, PLAINTIFFS' CLAIMS  WOULD BE SUBJECT TO DISMISSAL UNDER RULE 12(b)(6).

Even if the Mandamus Act or  the APA could be construed as permitting this Court to review the reasonableness of the delay in completing the processing of Plaintiff's adjustment application, Rule 12(b)(6) would require dismissal of any such claim.  The D.C. Circuit has identified six factors courts should consider when reviewing claims that allege unreasonable agency delay:

> (1) the time agencies take to make decisions must be governed by a "rule of reason"; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'"

In re United Mine Workers of America Inter. Union, 190 F.3d 545, 547 (D.C. Cir. 1999) (quoting Telecommunications Research & Action Ctr. v. FCC, 750 F.2d 70, 75-77, 79 (D.C. Cir. 1984) ("TRAC").  Where, as here, Congress has declined to establish a specific timetable for agency action, the Court is "not free to ignore that judgment and rewrite the statute to include a specific timetable."  In re American Fed. of Govt. Employees AFL-CIO, 837 F.2d 503, 506 (D.C. Cir. 1988).  The D.C. Circuit also has emphasized the importance of considering the agency's competing priorities, noting that agencies should be given "great latitude in determining their agendas."  In re Monroe Comms. Corp., 840 F.2d 942, 946 (D.C. Cir. 1988).

The complaint does not allege facts sufficient to support Plaintiffs' claim that USCIS has unreasonably delayed processing her adjustment application and that the FBI has unreasonably

delayed completing the national security investigations.  As noted, Congress has established no

timetable for processing adjustment applications or national security investigations.  Further, the

competing interests at issue in this case militate against granting Plaintiffs the relief they seek.

The D.C. Circuit has "declined to grant relief, even when all the other factors considered in

TRAC favored it, where a judicial order putting the petitioner at the head of the queue would

simply move all others back one space and produce no net gain."  Mashpee Wampanoag Tribal

Council, Inc. v. Norton, 336 F.3d 1094, 1100 (D.C. Cir. 2003) (citing In re Barr Labs., Inc., 930

F.2d 72, 75 (D.C. Cir. 1991)).  Yet that is precisely what Plaintiffs ask this Court to do.

Defendants and the numerous individuals with pending adjustment applications have a strong

interest in processing the applications in an orderly fashion and ensuring that all applicants are

treated the same.  See generally Walker Decl. ¶ 20 (noting that as of May 2007 there were

329,160 immigration applications awaiting responses on FBI name checks).  Allowing any alien

that files a lawsuit to leapfrog to the head of the queue would be contrary to those interests, and

potentially would lead applicants with pending background checks to flood the federal courts with

mandamus actions in order to obtain that advantage.  As the Eastern District of Virginia has

recognized,

> to grant relief in this case would set a dangerous precedent, sending a clear signal
> that more litigious applicants are more likely to be moved to the top of the
> proverbial pile over other applicants that have waited even longer.  Such a
> situation hardly optimizes resources, and serves only the individual at the
> detriment to the group.

Dmitrenko v. Chertoff, No. 07-82, 2007 WL 1303009, at * 1 (E.D. Va. Apr. 30, 2007); see also

id. at n. 1 ("To grant relief to today's petitioners, compelling adjudication of their application over

persons that have waited even longer, would be far from equitable.").  While Plaintiffs may desire

immediate adjudication of their applications, they have no entitlement to that relief.

Finally, Defendants' obligation to protect national security is another "competing interest" that makes any delay reasonable. Background checks serve an important law-enforcement and public safety purpose. See Li v. Chertoff, 482 F. Supp. 2d 1172, 1178 (S.D. Cal. 2007); Cannon Decl. ¶¶ 17,20. Accordingly, courts have found it reasonable for an adjustment application to remain pending for long periods of time when the delay is attributable to an ongoing security investigation. See Zahani, 2006 WL 2246211, at *3 (noting "[c]ourts have routinely found delays caused by FBI background checks to be justifiable delays" and citing cases); Zheng v. INS, 933 F. Supp. 338, 341 (S.D.N.Y. 1996) (dismissing case pursuant to 12(b)(6) because delaying processing of application pending completion of background checks was not an unreasonable delay); Jabr v. Chertoff, No. 4:06cv00543, 2006 WL 3392504, at *2 (E.D. Mo. Nov. 21, 2006) (finding plaintiffs failed to state a claim for unreasonable agency delay although adjustment application had been pending for more than two years due to background checks). For all the foregoing reasons, Plaintiffs have failed to state a claim for unreasonable delay in adjudicating their I-485s.

### III.    IN THE ALTERNATIVE, THE COURT SHOULD TRANSFER THE CASE TO THE NORTHERN DISTRICT OF TEXAS.

This case is governed by the general venue statute, 28 U.S.C. § 1391, which establishes default rules for venue that apply to federal lawsuits where the underlying statutes do not specify their own venue rules. See 28 U.S.C. § 1391(a), (b), and (e) (each applying "except as otherwise provided by law."). Section 1391 identifies three possible bases for venue for claims against federal government officials or agencies: (1) where a defendant "resides;" (2) the district where "a substantial part of the events or omissions giving rise to the claim occurred;" or (3) where "the plaintiff resides, if no real property is involved in the action." 28 U.S.C. § 1391(e). Plaintiffs

appear to rely on the first prong of this test, and allege that venue is proper in this Court because the agency heads named as Defendants have offices in the District of Columbia. See Compl. ¶ 3.

When a plaintiff bases its venue arguments solely on federal agency defendants' presence in Washington D.C., the venue challenge should be examined "very closely." Cameron v. Thornburgh, 983 F.2d 253, 256 (D.C. Cir. 1993). That close scrutiny has led courts in this District to invoke their transfer authority pursuant to 28 U.S.C. § 1404(a) and transfer cases to a district with a closer nexus to the parties' dispute. See, e.g., Cameron, 983 F.2d at 256 (ruling Washington, D.C. was not the proper venue because the sole connection to Washington, D.C. was the inclusion of the Director of the Federal Bureau of Prisons and the Attorney General in their official capacities); Abusadeh v. Chertoff, 2007 WL 2111036, at *6-*9 (D.D.C. July 23, 2007) (transferring mandamus action seeking adjudication of I-485 to Southern District of Texas because that was where the application was being adjudicated); Rosales v. United States, 477 F. Supp.2d 213, 215-17 (D.D.C. 2007) (transferring case against federal agency to district in which the challenged events took place); Southern Utah Wilderness Alliance v. Norton, 315 F. Supp.2d 82, 886-89 (D.D.C. 2005) (concluding environmental case should be transferred to Utah where D.C. officials only set general policies and did not make specific decisions being appealed); Joyner v. District of Columbia, 267 F. Supp.2d 15, 20-21 (D.D.C. 2003) (holding that the case's only connection to Washington, D.C. was the situs of named federal government defendants and transferring to a district with which the case had several connections). Otherwise, "[b]y naming high government officials as defendants, a plaintiff could bring suit here that properly should be pursued elsewhere." Cameron, 983 F.2d at 256.

The fact that some of the Defendants are high government officials who reside in the District of Columbia does not establish a sufficient connection to this District, and the Court

should transfer this case to the Northern District of Texas.  Section 1404(a) permits the Court to

transfer this case to "any other district or division where it might have been brought" for the

"convenience of parties and witnesses, in the interest of justice."  28 U.S.C. § 1404(a).  A

threshold question is whether the case could have been brought in the district to which transfer is

sought.  See Stewart Organization v. Ricoh Corp., 487 U.S. 22, 29 (1988) (citing Van Dusen v.

Barrack, 376 U.S. 612, 613 (1964)).  The Court then must engage in a case-by-case analysis and

balance the private interests of the parties with public interests such as efficiency and fairness.  Id.

at 29; Abusadeh, 2007 WL 2111036, at *3.  The moving party bears the burden to establish that it

is proper to transfer the case.  See Southern Utah, 315 F. Supp. 2d at 86.  Trout Unlimited v.

United States Dep't of Agriculture, 944 F.Supp. 13, 16 (D.D.C. 1996) (citing Air Line Pilots

Ass'n v. Eastern Air Lines, 672 F.Supp. 525, 526 (D.D.C. 1987) (citations omitted).  Plaintiffs

could have brought this case in the Northern District of Texas, and both the private and public

interests favor transfer to that court.

The Northern District of Texas clearly is a district in which this case "might have been

brought."  The Texas Service Center is responsible for adjudicating Plaintiffs' adjustment of

status applications; therefore any delay in the processing of those applications concern that office,

which is located in Dallas, Texas.  See Walker Decl. ¶ 18.  As a result, the events or omissions

giving rise to Plaintiffs' claims occurred in the Northern District of Texas, making venue proper

in that court under 28 U.S.C. § 1391.  See Abusadeh, 2007 WL 2111036, at * 6 (concluding

venue was proper in Southern District of Texas because I-485 was being adjudicated there).

The private interests favor transfer.  The factors courts consider when assessing those

interests include: Plaintiff's choice of forum, Defendants' choice of forum, whether the claim

arose elsewhere, convenience of the parties, convenience of the witnesses, and ease of access to

sources of proof.  See Trout Unlimited, 944 F.Supp. at 16 (citation omitted). Although courts generally accord substantial deference to a plaintiff's choice of forum, that deference is lessened when the forum chosen is not the plaintiff's home forum.  See  Shawnee Tribe v. United States, 298 F.Supp.2d 21, 24 (D.D.C. 2002) (citing Piper Aircraft Co. v. Reyno, 454 U.S. 235 (1981)). Courts also apply less deference when the chosen forum has an inadequate nexus to the events in the case.  See Southern Utah Wilderness Alliance, 315 F. Supp.2d at 86.

Plaintiffs' choice of forum deserves little deference because they do not reside in this District, and because this District lacks meaningful ties to the controversy.  Plaintiffs reside in Connecticut.  See Compl. ¶ 4.  The Northern District of Texas is a more appropriate forum, because that is where the relevant decisions were and will be made.  As noted, the Texas Service Center is charged with adjudicating Plaintiffs' adjustment applications.  See Walker Decl. ¶¶ 18-19.  The named agency defendants will have no direct involvement in the adjudication of that application.  Accordingly, this case is similar to other cases in which courts have found that the private interests favor transfer because the "primary issue in th[e] case" concerns a decision made by an agency field office, and not headquarters.  Southern Utah Wilderness Alliance, 315 F. Supp.2d at 87; see, e.g., Rosales, 477 F. Supp. 2d at 216; Shawnee Tribe, 298 F. Supp.2d at 24; Sierra Club v. Flowers, 276 F.Supp. 62, 67-68 (D.D.C. 2003) (transferring case because federal officials in Florida made the relevant decision and officials in Washington, D.C. were not involved in the decision-making process); see also Airport Working Group of Orange County, Inc. v. United States Dep't of Defense, 226 F. Supp.2d 227, 230-31 (D.D.C. 2002) (transferring because connection to DC was "attenuated" where D.C. officials were not actively involved in challenged decision).

The FBI's involvement in the background name check process also does not establish a close nexus to this District. The background checks are not initiated by the FBI. See Walker Decl. ¶ 5. The FBI's completion of those background checks is not monitored by USCIS in Washington, D.C., but rather by the Texas Service Center. See id. ¶¶ 6-8, 18. Local officials at the Texas Service Center conduct the decision-making process and will make the final decision. See id. ¶¶ 18-19. In sum, the FBI has a very routine role regarding Plaintiff's application — to conduct the background checks and send the results to USCIS. It does not determine whether, when, or how the adjustment application will be adjudicated. See Cannon Decl. ¶ 40. Accordingly, even if the FBI officer(s) conducting Plaintiffs' national security investigations were located in Washington, D.C., that would not make this Court the proper forum.

Other private interest factors also support transfer. The Northern District of Texas is Defendants' choice of forum, and Defendants have legitimate reasons for the Court to transfer the case there. That district is the home jurisdiction of the Texas Service Center, which is charged with and is responsible for adjudicating Plaintiff's pending adjustment application. Since this case involves activities taking place in the Northern District of Texas, there is local interest in resolving it there. See Schmidt v. American Institute of Physics, 322 F. Supp.2d 28, 36 (D.D.C. 2004) (holding that cases should be resolved in the locale in which they arise); Abusadeh, 2007 WL 2111036 at *8 (transferring case to jurisdiction where USCIS field office was located because of that district's interest in resolving the dispute). That also makes the Northern District of Texas a more convenient jurisdiction in which to litigate this case because the people directly involved in making the determination as to Plaintiffs' applications are located in Texas. See Walker Decl. ¶¶ 18-19.

The public interest also favors transfer.  The relevant considerations include: the transferee's familiarity with governing laws, relative congestion of the calendars of the potential transferee and transferor courts, and local interests in deciding local controversies at home.  <u>See Trout Unlimited</u>, 944 F.Supp. at 16 (citation omitted); <u>Airport Working Group of Orange County, Inc.</u>, 226 F. Supp.2d at 229.  Since this action concerns federal law, the Northern District of Texas is as familiar with the applicable law as the District of Columbia.  In addition, there is no evidence that the Northern District of Texas's docket is significantly more congested than the District of Columbia's docket.  <u>See Trout Unlimited v. United States Dep't of Agriculture</u>, 944 F.Supp. at 16; <u>see also</u> Exh. 4 (spreadsheet demonstrating caseload of both districts).   In 2006 the districts had a similar number of pending cases (4,326 in the Northern District and 4,114 in this Court), and civil cases in the Northern District were resolved more quickly than civil cases in this Court.  <u>See id.</u>  Accordingly, both factors weigh in favor of the Court transferring this case to the Northern District of Texas.

The Court's analysis in <u>Abusadeh v. Chertoff</u> is instructive.  There, as here, the Plaintiff filed a mandamus complaint seeking to compel USCIS to complete its adjudication of a pending immigration application.  <u>See</u> 2007 WL 2111036 at *2.  The Plaintiff's application was pending in a local USCIS field office in Texas.  <u>See id.</u> at *6.  Plaintiff filed suit in this District, and named agency officials with offices in Washington, D.C. as defendants.  <u>See id.</u>  District Judge Kollar-Kotelly concluded that Abusadeh's choice of forum was entitled to little deference because there were no meaningful ties between this District and pending immigration applications being adjudicated by a USCIS field office outside Washington, D.C.  <u>See id.</u> at * 6-*8.  Further, the public interests favored transfer because both districts were equally familiar with the applicable law but the Southern District of Texas had a "superior interest in addressing the instant

26

controversy because 'there is a local interest in having localized controversies decided at home.'"

Id. at *8.  The same is true here.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court GRANT

Defendants' motion to dismiss or, in the alternative, TRANSFER this case to the Northern

District of Texas.

Dated:  December 5, 2007                    Respectfully submitted,


   /s/ Jeffrey Taylor by MJ
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


   /s/ Rudolph Contreras by MJ
RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney


   /s/ Robin M. Meriweather
ROBIN M. MERIWEATHER, D.C. Bar. # 490114
Assistant United States Attorney
555 Fourth St., N.W.
Washington, D.C.  20530
Phone: (202) 514-7198 Fax: (202) 514-8780
Robin.Meriweather2@usdoj.gov

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
XIN HE & LIN PAN,                       )
                                        )
                Plaintiffs,             )
                                        )
        v.                              )    Case Number: 1:07CV1449(PLF)
                                        )
MICHAEL CHERTOFF, Secretary of the      )
United States Department of Homeland    )
Security, et al.,                       )
                Defendants.             )
_____)

**ORDER**

Upon consideration of Defendants' Motion to Dismiss or Transfer, it is this

_____ day of _____, 200____,

_____ ORDERED that the Motion to Dismiss be and hereby is GRANTED, and that

complaint be and hereby is DISMISSED;

_____ ORDERED that the Motion to Transfer be and hereby is GRANTED, and that the

case be and hereby is TRANSFERRED to the United States District Court for the

Northern District of Texas.

SO ORDERED.

_____
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

Xin He & Lin Pan

              Plaintiff,

v.                                                     Civ. Act. Number: **1:07-cv-01449-PLF**

Department of Homeland Security, et. Al

              Defendants.

## DECLARATION

I, the undersigned officer of the Texas Service Center, United States Citizenship and Immigration Services, pursuant to 28 U.S.C. 1746, do hereby declare the following under the penalty of perjury:

1. I am over the age of 21 and of sound mind.   I am an officer with the Texas Service Center, U.S. Citizenship and Immigration Services. There are five USCIS regional Service or Benefit Centers throughout the United States, each of which has jurisdiction over certain applications and petitions filed by persons or companies within its respective geographic jurisdiction, and/or exclusive nationwide jurisdiction over other types of applications. These Centers adjudicate cases on a mail-in basis only; they do not conduct in-person interviews. Employment-based adjustment of status cases like Plaintiff's are handled at the Nebraska and Texas Service Centers. TSC processes many type of applications/petitions that do not require personal interviews and anticipates annual receipts of about 800,000 with about 700,000 anticipated completions. The TSC receives roughly 6,000 pieces of mail a day, sends out a corresponding amount, and has about 2,000,000 active files.

2. The Plaintiff filed an I-140/I-485. The goal of the 1-140 and 1-485 filings are to obtain lawful permanent resident ("green card") status for Plaintiff and any qualified dependent spouse or child through Plaintiff's employment. By statute, only about 140,000 aliens can get green cards through employment-based categories during each fiscal year, with percentage limits set per country and preference category. These visa numbers are tracked and issued by the

Department of State. The I-485 cannot be approved until after the I-140 is approved. There is often a need to further develop the information needed for an I-140 petition before the I-485 may be considered. Similarly, there is often a needed to further develop the information needed for an I-485 application before it is ready for consideration.

3.  Center Adjudications Officer, under authority delegated by the Director, independently evaluates and weighs the sometimes voluminous and complex evidence and statements a petitioner submits, may request additional evidence from the petitioner and others, makes discretionary factual determinations and resolves any conflicts in the evidence, reviews decisions of the Administrative Appeals Office (an appellate adjudicatory body that decides appeals and issues decisions), Policy Statements and Procedural Manuals issued under the authority of the Director of U.S.CIS, the Foreign Affairs Manual of the Department of State, the INA and other legal sources, and drafts a proposed written decision for the Director of the Texas Service Center that is consistent with the precedents, the policies, factual determinations, the Director's exercise of discretion, and the petitioner's burden of proving that they should be granted the visa petition and adjustment application. The decision to approve an immigrant visa or an adjustment involves national security, social, political and foreign policy considerations and determines when, how, and under what conditions foreign nationals are to be allowed to remain within the United States. Adjudications officers work. The decisions are subject to internal review before the Director accepts it. If the petitioner does not agree with the Director's Decision on the Immigrant Visa Petition, the petitioner may appeal to the Administrative Appeals Office to correct any errors in the decision but there is no internal appeal process for denial of an I-485. An I-485 can be reconsidered upon motion and it can be renewed before an immigration judge during removal proceedings.

4.  General requirements for employment-based adjustment of status applications are that the alien is the beneficiary of an approved 1-140 visa petition (or whose spouse is such a beneficiary), is in lawful immigration status on the date the Form 1-485 is filed, has a visa number immediately available under the annual per-country and preference category quota, and is not inadmissible to the United States under listed statutory grounds that include health-related, criminal, and national security provisions.

5.  Once USCIS receives an I-485, a file is opened and an electronic record of that application is created. Much of this initial electronic processing and data entry is automated, including the automatic generation and electronic transmission of a required national security screening request in FBIQUERY, the FBI repository and tracking system for FBI Name Check requests. Once the initial file creation and processing of an I-485 application is complete, each file is placed on a Just In Time ("JIT") shelf for processing and adjudication in chronological order according to date of receipt.

6. Initially, the TSC runs a daily electronic report in FBIQUERY system for all files on the JIT shelf to confirm the successful transmission of the FBI Name Check request and to identify those applications that have received responses from the FBI name checks and FD-258 (fingerprints) and are thus ready for adjudication. FBI name check requests that have been received by the FBI but have not yet been completed are indicated by a notation of "Pending" in FBIQUERY. An FBI Name Check that has been completed will be indicated by various entries depending on the result.

7. This report will also identify those I-485 applications that have received a "No Data" or "Error" response in FBIQUERY indicating a problem with transmission of the name check request from USCIS to the FBI. If such a problem is reported, the FBI name check requests will then be initiated a second time and resent manually or electronically to the FBI for a response. In this way USCIS ensures that the FBI has in fact received all requests for name checks

8. All files on the FBI Name Check Shelf are audited regularly in order to identify those in which a response from the FBI has been received. In this manner the agency ensures that as FBI responses are received, files are expeditiously released for adjudication.

9. Due both to the sheer volume of security checks USCIS conducts, and the fact that USCIS must await responses from the internal security agencies that conduct some of the required security checks, some delays on individual applications are unavoidable and may be lengthy.

10. Service Centers have a process for expediting processing of certain applications and petitions. However, it is important to note that whenever a particular application or petition receives expedited processing and is moved up in the adjudications queue, it is at the expense of those still unadjudicated petitions or applications that bear an earlier filing date. If, for example, USCIS asks the FBI to expedite a case, this action comes at the expense of other name check cases, many of which have been pending since December 2002, because FBI would have fewer resources with which to work the other pending cases. USCIS is currently limited in the number of expedite requests that can be made to the FBI each week, and there is a backlog even in submitting the expedite requests for cases that have been deemed to meet expedite criteria.

11. In order to address in a consistent and fair manner the increasing number of mandamus actions filed nationwide by aliens awaiting decisions on their petitions and applications, USCIS issued specific guidelines for requesting an expedited name check from the FBI. Expedited processing may be pursued in cases at USCIS's discretion for military deployment, age-out cases and

applications affected by sunset provisions, significant and compelling reasons such as critical medical conditions, loss of social security benefits or other subsistence, severe financial loss, extreme emergent situation, humanitarian situation, nonprofit status of requesting organization in furtherance of the cultural and social interest of the United States, Department of Defense/National Interest requests from official U.S. government entity, USCIS error, or compelling interest of USCIS.

12. To my knowledge, Plaintiff has not made a formal request for expedited processing. Expedite requests are determined on a case-by-case basis. Plaintiff states in their complaint that they wishes to have their green card quickly so that they may begin accruing the years needed to apply for U.S. citizenship. This is a common reason for an alien to desire lawful permanent resident status and does not generally, as a single factor, constitute a special circumstance that would justify emergency or expedited processing. Other common reasons include a desire for "peace of mind" and the inability of non-lawful permanent residents or non-U.S. citizens to: petition for alien relatives, work and travel without special permission, get grant funds for research, apply for desirable jobs, qualify for scholarships or fellowships, or get in-state tuition for self, spouse or dependents.

13. Another common factor in the many mandamus lawsuits filed against USCIS involving pending FBI name checks is the plaintiffs' claims that they made repeated status inquiries about their case to USCIS, FBI, Congress, and the White House. While multiple status inquiries show the applicants frustration with the pace of the processing of their applications, the inquiries, and mandamus actions, increase the workload of the FBI and USCIS, rather than having the effect of faster or special treatment of the subject applications. USCIS neither tracks nor records customer service inquiries in the administrative record.

14. When an alien applies for adjustment of status, USCIS conducts several forms of security and background checks to ensure that the alien is eligible for the immigration benefit and they is not a risk to national security or public safety. In addition to records checks against DHS's own immigration systems, these background checks currently include (a) a Federal Bureau of Investigation (FBI) fingerprint check for relevant criminal history records on the alien (e.g., arrests and convictions); (b) a check against the DHS-managed Interagency Border Inspection System (IBIS) that contains records and "watch list" information from more than twenty federal law enforcement and intelligence agencies, such as the Central Intelligence Agency (CIA), FBI, other divisions of the United States Department of Justice, Department of State, DHS/U.S. Customs and Border Protection (CBP), and other DHS agencies (IBIS includes, but is not limited to, information related to persons who are wanted or under investigation for serious crimes or suspected of terrorism-related activity) ; and (c) an FBI name check, which is run against FBI investigative

databases containing information that is not necessarily revealed by the FBI's fingerprint check or IBIS.

15. These law enforcement checks have revealed significant derogatory information on various alien applicants for immigration benefits, including applicants seeking permanent residency, which has resulted in the alien being found ineligible for the benefit and USCIS's denial of the application. Where applicable, the information has also resulted in aliens being arrested by law enforcement agencies or charged under removal grounds and deported from the United States following a final order of removal. In many instances, the disqualifying information on the alien has been discovered as a result of the IBIS or FBI name checks, but it has not been revealed by a fingerprint check alone.

16. Since the terrorist attacks of September 11, 2001, the need to conduct more rigorous and thorough background checks on aliens who are seeking immigration status in the United States has required procedures that sometimes result in individuals not receiving their documents and benefits as quickly as in the past. In order to ensure national security and public safety, as well as to reduce the waiting time for adjudication and documentation of lawful status, USCIS is currently working with DOJ, DHS, and ICE to develop and implement improved procedures that will ensure that all of the background checks are completed and the results considered as quickly as possible. However, the public safety requires USCIS to make certain that the checks have been done before it adjudicates any application or petition and before it issues any immigration status documents to such persons. USCIS will continue to perform any outstanding background and security checks as expeditiously as possible to help ensure that no eligible alien must wait longer than is reasonably necessary to receive a decision on his or her application or petition and to receive evidence of his or her immigration status.

17. The fingerprint check must be less than fifteen months old at the time any application or petition is adjudicated. The rescheduling of fingerprints is done to ensure that the case is ready to be adjudicated once Plaintiff's name check clears. Plaintiff's preliminary IBIS checks have been completed.. Since 9/11, USCIS has submitted millions of name check requests to the FBI, thus taxing that agency's resources and creating a backlog in FBI's performance of complete security checks. During the initial submission period of December 2002 and January 2003, USCIS submitted almost 3 million names to the FBI.

18. I have custody of the TSC records of Xin He & Lin Pan, A97164098 & A97164097, and I supervise TSC officers who are processing Xin He & Lin Pan's applications. After reviewing the information pertaining to Xin He & Lin Pan, I attest that USCIS has referred this case for lawfully required security screening of aliens and that TSC suspended its processing in

accordance with the requirements for security screening of aliens using intelligence information having a bearing on the security of the United States.

19. During the normal processing of this case, a national security screening was requested. To date, Plaintiff Xin He's application remains pending the completion of national security background investigations. Once the required national security background investigations are completed, plaintiffs' applications will be adjudicated. Because Plaintiff's Lin Pan's application for adjustment of status to lawful permanent resident, I-485 is dependent upon Xin He's application Plantiff Lin Pan's application cannot be approved unless and until Plantiff Xin He's application is approved. A response is required from the FBI before the case can be adjudicated. The information and records pertaining to Xin He & Lin Pan shows that TSC Officers under my supervision make regular inquiries about the status of their security screening. Plaintiffs' applications for adjustment of status are ready to be adjudicated except for their pending background and security check.

20. The Texas Service Center currently has approximately 114,500 employment-based Form I-485 adjustments of status cases pending, about 34,549 of which are still awaiting completion of FBI name checks before they can be adjudicated. Of an additional 27,332 pending asylum-based Form 1-485 adjustment of status cases, there are approximately 1,235 awaiting responses on FBI name checks. Of a total figure of approximately 148,790 naturalization applications filed and pending at TSC, approximately 48,059 are awaiting responses on FBI name checks. USCIS reports that there were 329,160 applications, nationwide, awaiting responses on FBI name checks as of May 2007. Of this number, 31,144 cases have been pending name check results for more than 33 months."

Genize X. Walker
Supervisory Adjudication Officer

12-4-07
Date

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

XIN HE and LIN PAN,                    )
                                       )
          Plaintiffs,                  )
                                       )
     v.                                )          Case No:
                                       )          1:07-CV-01449
MICHAEL CHERTOFF,                      )
     et al.,                           )
                                       )
          Defendants.                  )
                                       )

## DECLARATION OF MICHAEL A. CANNON

Michael A. Cannon, pursuant to 28 U.S.C. § 1746, declares the following:

(1)     I am currently the Section Chief of the National Name Check Program Section ("NNCPS") at the Headquarters of the Federal Bureau of Investigation ("FBI") in Washington, D.C. I have held that position since March 7, 2005.

(2)     In my current capacity as Section Chief, I supervise the National Name Check Units. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3)     Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the policy and the procedures of the United States Citizenship and Immigration Services ("USCIS"). Specifically, I am aware of the name check request for Xin He and Lin Pan, the plaintiffs in this civil action.

## NATIONAL NAME CHECK PROGRAM

(4)    The National Name Check Program ("Program") has the mission of disseminating information from the FBI's Central Records System in response to requests submitted by federal agencies, congressional committees, the federal judiciary, friendly foreign police and intelligence agencies, and state and local criminal justice agencies. The Central Records System ("CRS") contains the FBI's administrative, personnel, and investigative files. The Program has its genesis in Executive Order No. 10450, issued during the Eisenhower Administration. That executive order addresses personnel security issues and mandates National Agency Checks as part of the pre-employment vetting and background investigation process for prospective Government employees. The FBI performs the primary National Agency Check conducted on all United States Government employees. From this modest beginning, the Program has grown exponentially, with more and more customers seeking background information from FBI files on individuals before bestowing a privilege, such as Government employment or an appointment, a security clearance, attendance at a White House function, a "green card" or naturalization, admission to the bar, or a visa. More than 70 federal, state, and local agencies regularly request FBI name searches. In addition to serving our regular Government customers, the FBI conducts numerous name searches in direct support of the FBI's counterintelligence, counterterrorism, and homeland security efforts.

## EXPLANATION OF THE CENTRAL RECORDS SYSTEM

(5)    The FBI's CRS enables the FBI to maintain all information which it has acquired in the course of fulfilling mandated law enforcement responsibilities. The records maintained in the CRS consist of administrative, applicant, criminal, personnel, and other files

2

compiled for law enforcement purposes. This system consists of a numerical sequence of files broken down according to subject matter. The subject matter of a file may relate to an individual, organization, company, publication, activity, or foreign intelligence matter. Certain records in the system are maintained at FBI Headquarters. Records which are pertinent to specific FBI Field Offices are mostly maintained at those Field Offices.

(6)     FBI Headquarters and each Field Division can access the CRS through the FBI's General Indices. The General Indices are arranged in alphabetical order and consist of indices on various subjects, including the names of individuals and organizations. Only the information considered pertinent, relevant, or essential for future retrieval is indexed.

(7)     Communications directed to FBI Headquarters from various Field Offices and Legal Attaches are filed in the pertinent case files and indexed to the names of individuals, groups, or organizations which are listed in the case captions or titles as subjects, suspects, or victims. Searches made in the index to locate records concerning particular subjects are made by searching the name of the subject requested in the index.

(8)     The entries in the General Indices fall into two categories:

   (a)     "main" entries – entries that carry the name corresponding with the subject of a file contained in the CRS.

   (b)     "reference" entries – entries (sometimes called "cross-references") that generally only mention or reference an individual, organization, etc., that is contained in a document located in another "main" file.

(9)     In 1995, the FBI implemented the Automated Case Support ("ACS") system for its Headquarters, Field Offices, and Legal Attaches. More than 105 million records were converted from automated systems previously utilized by the FBI. The ACS system

3

consists of the following three automated applications that support case management functions for all investigative and administrative cases:

(a)     Investigative Case Management:  This application provides the ability to open, assign, and close investigative and administrative cases as well as to set, assign, and track leads.  A case is opened by the Office of Origin, which sets leads for itself and other field offices, as needed.  The offices that receive the leads are referred to as Lead Offices. When a case is opened, it is assigned a Universal Case File Number, which is utilized by FBI Headquarters and all offices conducting or assisting in the investigation.  Using fictitious file number "111-HQ-12345" as an example, an explanation of the Universal Case File Number is as follows: "111" indicates the classification for that specific type of investigation; "HQ" is the abbreviated form used for the Office of Origin of the investigation (in this case, FBI Headquarters); and "12345" indicates the individual case file number for that particular investigation.

(b)     Electronic Case File:  This application serves as the central electronic repository for the FBI's official text-based documents.  It supports the universal serial concept, where only the creator of a document serializes it into a file, providing single source entry of serials into the computerized system.  All serials originated by the Office of Origin are maintained in the Office of Origin's case file.

(c)     Universal Index:  This application, sometimes referred to as "UNI", continues the universal concepts of the ACS system by providing a complete subject/case index to all investigative and administrative cases.  Only the Office of Origin is required to index.  However, the Lead Offices may index additional information as needed.  The Universal Index, which consists of an index of approximately 99.6 million records, functions to index names to cases, and to search names and cases for use in the FBI investigative and administrative cases.  Names of individuals or entities are recorded with identifying information such as the date or place of birth, race, sex, locality, social security number, address, or date of event.

4

(10)    The decision to index names other than subjects, suspects, and victims is a discretionary decision made by the investigative FBI Special Agent, the supervisor in the field division conducting the investigation, and the supervising FBI Special Agent at FBI Headquarters. The FBI does not index every name in its files, but indexes only that information considered pertinent, relevant, or essential for future retrieval. Without a "key" (index) to this mass information, information essential to ongoing investigations could not be readily retrieved. The FBI files would thus be merely archival in nature and could not be effectively used to serve one of the mandated missions of the FBI, to investigate violations of federal criminal statutes. Therefore, the General Indices to the CRS files are the means by which the FBI can determine what retrievable information, if any, the FBI may have in its CRS files on a particular subject matter.

(11)    When the FBI searches a person's name, the name is electronically checked against the FBI's Universal Index. The searches seek all instances of the individual's name, social security number, and dates close to his or her date of birth, whether a main file or reference. As previously stated, any "main" file name would be that of an individual who is, himself or herself, the subject of an FBI investigation, whereas any "reference" would be an individual whose name appears as part of an FBI investigation. For example, "references" include associates, witnesses, or conspirators. Additionally, there may be a myriad of other reasons to explain why an FBI Special Agent conducting an investigation believed it important to include a particular name in the FBI's index for later recovery. The names are searched in a multitude of combinations, switching the order of first, last, and middle names, as well as combinations with only the first and last names, first and middle names, and so on. The Program

5

application searches names phonetically against the Universal Index records and retrieves similar spelling variations (which is especially important considering that many names in our indices have been transliterated from a language other than English).

(12)    If there is a match with a name in a FBI record, it is designated as a "Hit," meaning that the system has stopped on a possible match with the name being checked.  If a search comes up with a match to a name and either a close date of birth or social security number, it is designated an "Ident."

## RESOLUTION RATE

(13)    There are four stages involved in the completion of an individual name check: batch processing, name searching, file review, and dissemination.  The first stage in the process, batch processing, involves the transfer of the name check requests from USCIS to the NNCPS on magnetic tapes.  Each tape can hold up to 10,000 names.  (Some requests are transmitted via facsimile or verbally via telephone.)  The tapes are uploaded into an FBI system and the names are electronically checked against the FBI's Universal Index (UNI).  Historically, during the batch processing phase, approximately 68 percent of the name checks submitted by USCIS are returned to USCIS as having "No Record" within 48-72 hours.  A "No Record" indicates that the FBI's Universal Index database contains no identifiable information regarding a particular individual.  Duplicate submissions (i.e., identically spelled names with identical dates of birth and other identical information submitted while the original submission is still pending) are not checked, and the duplicate findings are returned to USCIS within 48-72 hours.

(14)    The second stage in the process is name searching.  For the name check requests that are still pending after the initial electronic check, additional review is required.  An

FBI employee in the NNCPS physically enters the applicant's name into the computer database searching different fields and information. A secondary manual name search completed typically within 30-60 days historically identifies an additional 22 percent of the USCIS requests as having "No Record," for a 90 percent overall "No Record" response rate. The results of this 22 percent also are returned to USCIS.

(15)    The third and fourth stages in the process are file review and dissemination. The remaining 10 percent are identified as possibly being the subject of an FBI record. At that point, the FBI record must be retrieved and reviewed. If the record was electronically uploaded into the FBI's ACS electronic record-keeping system, it can be reviewed quickly. If not, however, the relevant information must be retrieved from an existing paper record. Review of this information will determine whether the information is identified with the request. If the information is not identified with the request, the request is closed as a "No Record" and USCIS is so notified.

(16)    Additional searches against the FBI's Universal Index, additional manual name searches, and/or additional file review of a name check request, depending on the length of time a name check request is pending in the processing queue, may occur periodically during the name check process to ensure that stale information is updated.

(17)    Once a record is retrieved, the FBI reviews the file for possible derogatory information. Less than one percent of USCIS's requests are identified with a file containing possible derogatory information. If appropriate, the FBI forwards a summary of the derogatory information to USCIS.

7

(18)    At each stage of processing, the NNCPS generally works on the oldest name checks first – a first-in, first-served protocol. This protocol reflects that all applicants are equally deserving and ensures that all applicants are treated fairly. However, if an applicant's name check requires a review of numerous FBI records and files, even though that person came in first, the name check may require additional time until all responsive records are located and reviewed.

(19)    The general exception to the first-in, first-served policy exists when USCIS directs that a name check be handled on an "expedited" basis. USCIS determines which name checks are to be expedited based on criteria it determines. Once designated as an "expedite," that name check proceeds to the front of the queue along with other prioritized name check requests, in front of the others waiting to be processed.

(20)    Another exception to the first-in, first-served policy is a near-term effort agreed to by USCIS and the FBI to reduce the number of pending USCIS name check requests by prioritizing "single hit" name checks. This key initiative is explained in paragraph (33) below.

## GROWTH OF THE NAME CHECK PROGRAM

(21)    Prior to September 11, 2001, the FBI processed approximately 2.5 million name check requests per year. As a result of the FBI's post-9/11 counterterrorism efforts, the number of FBI name checks has grown. For fiscal year 2006, the FBI processed in excess of 3.4 million name checks.

(22)    A significant portion of the incoming name checks submitted over the past few years has been submitted by USCIS. In fiscal year 2003, 64% (approximately 3,929,000) of the total incoming name checks were submitted by USCIS; in fiscal year 2004, 46% (~1,727,000)

8

of the total incoming name checks were submitted by USCIS; in fiscal year 2005, 45%

(~1,512,000) of the total incoming name checks were submitted by USCIS; and in fiscal year

2006, 45% (~1,633,000) of the total incoming name checks were submitted by USCIS.

## USCIS NAME CHECK REQUESTS

(23)    In November 2002, heightened national security concerns prompted a

review of the former Immigration and Naturalization Service's ("INS's") procedures for

investigating the backgrounds of individuals seeking immigration benefits. It was determined

that deeper, more detailed clearance procedures were required to protect the people and the

interests of the United States effectively. One of the procedures identified was the FBI's name

check clearance. Before November 2002, only those "main" files that could be positively

identified with an individual were considered responsive to the immigration authorities name

check requests. However, because that approach ran a risk of missing a match to a possible

derogatory record, the FBI altered its search criteria to include "reference" files as well. From a

processing standpoint, this meant the FBI was required to review many more files in response to

each individual background check request.

(24)    In December of 2002 and January of 2003, the former INS resubmitted 2.7

million name check requests to the FBI for background investigations of all individuals with

then-pending applications for immigrations benefits for which the Immigration and Nationality

Act required background investigations. Those 2.7 million requests were in addition to the

regular submissions by the former INS. Currently, the FBI has returned an initial response to all

2.7 million resubmitted requests. Moreover, although many of the FBI's initial responses to

those resubmitted requests indicated that the FBI had no information relating to the specific

9

individual who was the subject of the request, approximately 16 percent – or over 440,000 – resubmitted requests indicated that the FBI may have information relating to the subject of the inquiry. The FBI is still in the process of resolving those 440,000 requests. Currently, less than 6,300 of those resubmitted requests remain pending.

(25)    The FBI's processing of the more than 440,000 residuals has delayed the processing of regular submissions from USCIS. A dedicated team within NNCPS has been assigned to handle only these re-submitted name check requests. To the extent that the team members are working on only these applications, they are unavailable to process the normal submissions.

(26)    There are numerous factors that have contributed to delays in the processing of name check requests. One is the volume of incoming name checks – the total volume of incoming name check requests combined with pending name check requests has historically outpaced the NNCPS's available resources to process this volume. As it concerns submissions by USCIS, for Fiscal Year 2006, USCIS submitted approximately 1,633,000 name check requests, of which approximately 718,000 represented naturalization-related name checks and approximately 658,000 represented adjustment of status-related name checks. As of the end of Fiscal Year 2006, the NNCPS had over 364,600 pending USCIS name check requests, of which over 157,300 represented naturalization-related name checks and over 157,800 represented adjustment of status-related name checks.

(27)    The number of "hits" on a name when it is reviewed may further contribute to a delay in processing a name check request. A "hit" is a possible match with a

10

name in an FBI record. The number of times the name appears in FBI records correlates to the number of records which require review.

(28)    The processing of common names also contributes to a delay in processing a name check request. The names associated with a name check request are searched in a multitude of combinations, switching the order of first, last, and middle names, as well as combinations with just the first and last, first and middle, and so on. Without detailed information in both the file and agency submission, it is difficult to determine whether or not a person with a common name is the same person mentioned in FBI records. Common names can often have more than 200 hits on FBI records.

(29)    The accessibility of the FBI record needed for review also contributes to a delay in processing a name check request. If the date of the record predates October 1995, the paper record has to be located, retrieved, and reviewed; if the date of the record is later than October 1995, the record text may or may not be available electronically depending on the type of record and whether it has been uploaded electronically. A paper record could be at one of over 265 possible locations across the country. Requests often involve coordinating the retrieval and review of files from the various 56 different FBI field offices. One person's name check may involve locating and reviewing numerous files, all at different physical locations. Each request must be communicated internally from the NNCPS to the field, and handled according to the current priorities of the particular field office. Since it is a paper based process, it is a process subject to misplaced or misfiled files. The process is time consuming and labor intensive.

11

(30)     Another contributing factor which was briefly mentioned earlier in this declaration is the expedited request. Processing an expedited case means that an employee is not available to work on a normal name check request.

## THE NATIONAL NAME CHECK PROGRAM IS ADDRESSING THE FACTORS THAT CONTRIBUTE TO DELAYS IN PROCESSING A NAME CHECK

(31)     The FBI is seeking a number of improvements to its process. Over the short-term:

(32)     NNCPS is continuing to develop the Name Check Dissemination Database ("NCDD"), an electronic repository for name check results, to eliminate manual and duplicate preparation of reports to other Agencies, and provide avenues for future automation of the name check process.

(33)     NNCPS is partnering with other Agencies to provide contractors and personnel to process name checks. For example, the FBI and USCIS have implemented a key initiative to use contractor resources to prioritize the processing of "Single-Hit" USCIS Name Check requests, that is, pending name check requests that have only one FBI file potentially identified with it that needs to be reviewed in order to process the request. By applying contractor resources to process these "Single Hit" requests, the FBI may significantly reduce the pending USCIS name check workload.

(34)     The FBI is in the process of hiring additional employees to fill current vacancies and has procured an employee development program to streamline the training of new employees, thereby significantly decreasing the amount of time needed before a new employee

12

can begin to significantly impact the NNCPS workload. These efforts have led to the development of a name check employee training manual.

(35)     NNCPS, through the Records Management Division's Records Automation Section, is scanning the paper files required for review in order to provide machine readable documents for the Dissemination Database. It is also building an Electronic Records System that allows for future automation of the name check process.

(36)     NNCPS is working with customers to streamline incoming product and to automate exchange of information.

(37)     As a mid-term improvement, NNCPS is exploring technology updates to the name check process. Specifically, the FBI procured textual analysis software in order to investigate ways to further automate the name check process. The goal is to incorporate analytical software applications that reduce the time spent to verify the identity of the individual and, once verified, assists in the adjudication analysis. This type of automation should decrease the time required to process a name check, thereby increasing production. The FBI is building a proof of concept system for eventual integration into the FBI's core databases.

(38)     As a long-term improvement, the FBI is developing a Central Records Complex that will create a central repository of records. Currently, paper files/information must be retrieved from over 265 locations throughout the FBI. The Central Records Complex will address this issue, creating a central repository-scanning of documents, and expediting access to information contained in billions of documents that are currently manually accessed in locations around the United States and world. In addition, the essential long term improvement for FBI Name Checks is to adjust the fee schedule to reflect the actual cost of providing name check

13

services. Once in place, the FBI will be able to scale resources proportionally with workload demands – pending name checks will pay for themselves. At this time fees do not cover the basic costs of providing the service. Therefore, the FBI cannot adequately apply resources to processing name checks without pulling critically needed personnel and funding from other programs. The FBI procured services to conduct a study to determine an appropriate fee structure. The independent contractor hired to conduct the study has completed its work and the proposed fee structure is undergoing the Federal rulemaking process.

   (39) For the reasons stated earlier, the FBI cannot provide a specific or general time frame for completing any particular name check submitted by USCIS. The processing of name checks, including those which are expedited at the request of USCIS, depends upon a number of factors, including where in the processing queue the name check lies; the workload of the analyst processing the name check; the volume of expedited name checks the analyst must process for, among others, military deployment, "age-outs," sunset provisions such as Diversity Visa cases, compelling reasons such as critical medical conditions, and loss of Social Security or other subsistence; the number of "Hits," (i.e., possible matches) that must be retrieved, reviewed and resolved; the number of records from various Field Offices that must be retrieved, reviewed and resolved; and, more generally, the staff and resources available to conduct the checks. Unfortunately, the proprietary software NNCPS utilizes to process name checks does not report where in the processing queue a particular name check request may lie vis-à-vis other name checks. Additionally, until review of each case is undertaken no estimate for the time required to complete it can even be attempted, no estimate can be made as to when the plaintiffs' cases will be reached by NNCPS staff, nor can any reliable estimate be made as to how long it will take to

14

complete the review once it has begun. While the FBI is sensitive to the impact of the delays in processing name check requests, the consequence of the FBI's mission on homeland security requires that its name check process be primarily focused on providing accurate and thorough results. When the name check is completed, the FBI provides the results to USCIS as quickly as possible.

(40)    It is important to note that the FBI does not adjudicate applications for benefits under the Immigration and Nationality Act. If appropriate, the FBI generally provides a summary of available information to USCIS for its adjudication process.

### PLAINTIFF'S NAME CHECK REQUEST

(41)    The name check request for plaintiff Xin He was received by the FBI from USCIS on or about July 31, 2003 and has not been completed. The FBI is performing its check in response to USCIS's request in accordance with the procedures outlined above. The results of the name check will be forwarded to USCIS in Washington, D.C., in due course, in accordance with the FBI's normal protocol.

(42)    The name check request for plaintiff Lin Pan was received by the FBI from USCIS on or about July 31, 2003 and was completed on March 2, 2004. The FBI performed its check in response to USCIS's request in accordance with the procedures outlined above. The results of the name check were forwarded to USCIS in Washington, D.C., in due course, in accordance with the FBI's normal protocol.

15

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this _15th_ day of October 2007.

MICHAEL A. CANNON
Section Chief
National Name Check Program Section
Records Management Division
Federal Bureau of Investigation
Washington, D.C.

16

## U. S. Citizenship and Immigration Services

TEXT ONLY   HOME   WHAT'S NEW   FAQs   SEARCH   GLOSSARY   FEEDBACK   PRINTPAGE

Services Field Office
Addresses and
Information

About USCIS Field
Offices

U.S. Field Office
State Map

List of U.S.
Field Offices

Texas

   Overview

   **About Us**

   Forms and Fees

Application Support
Centers Map

Application Support
Centers

National Benefit
Center



### About Us

General Information
Organizational Structure
Service Area
Where Are We?
Applications We Accept and/or Process
Mailing Your Application/Petition to Us
Contacting Us
Other Immigration Offices Serving This Area

**Director:** Evelyn Upchurch

Note: certain filing instructions and information is common to all USCIS Service Centers. Read more about them on our National Service Center page:

·     Documents Not in English

·     Preparing Your Application for Filing

·     Paying Fees

·     Your Receipt

·     Motions to Reopen (MTR)

·     Denials

·     How we Process Your Application at a Service Center

·     General Tips on Assembling Applications for Mailing

See also:

·     LIFE Act

·     Finding the Status of Your Case

·     Processing Dates

·     Special Registration (on the Immigration & Customs Enforcement website)

### Service Area:

The Texas Service Center accepts and processes certain applications and

petitions from individuals residing in the following states:

**Alabama, Arkansas, Florida, Georgia, Kentucky, Louisiana, Mississippi, New Mexico, North Carolina, South Carolina, Oklahoma, Tennessee, and Texas.**

Applications for asylum (Form I-589) may require filing at a different Service Center than indicated above; please check the instructions for Form I-589 to determine where you should file your application.

**Please Note:** If you live outside the service area of this Center, please file your application or petition with the Center serving your area. If you are unsure of which Service Center serves people living in your state, consult the List of USCIS Field Offices for your state. If you know which Service Center you wish to visit, you may use the following links:

California Service Center
Vermont Service Center
Nebraska Service Center

**Where Are We?**

The Texas Service Center is located in Dallas, Texas.

**SPECIAL NOTE:** Separate PO Box numbers and Zip codes are required for the different form types.

For General Correspondence, please use the following address:

USCIS TSC
P.O. Box 851488
Mesquite, TX 75185-1488

**Applications We Accept and/or Process:**


**Direct Mail Cases We Accept:**

**NOTE EXCEPTIONS:**
**Forms I-131,** Applications for Travel Document **(Re-entry Permit or Refugee Travel Document only)**, are filed with the Nebraska Service Center.
**Forms I-360, Self-Petitions** filed by Battered Spouse or Child petitions are filed at Vermont Service Center.
**Forms I-360 for G-4 International Organization Officers**, Employees, and their family members are filed at the Nebraska Service Center effective 2/23/04
**Forms I-485** for those individuals filed concurrently with an I-360 are also filed Only at the Nebraska Service Center effective 2/23/04
Forms I-730, Refugee/Asylee Relative petitions are filed with the Nebraska Service Center.
**Forms I-485, Refugee/Asylee/Haitian** applications are filed with the Nebraska Service Center.

All concurrently filed Forms I-140/I-485 should be submitted to the Nebraska Service Center effective 4/1/06.

Effective 7/24/06, all stand alone Forms I-485 based on a pending or an approved Form I-140 should be mailed directly to the Nebraska Service Center. Forms accompanying the I-485 (e.g., Form I-131 and/or I-765)

should also be filed at the Nebraska Service Center;

**Preparing Your Application for Filing:**

**Mailing Your Application/Petition to Us:**

You may also be eligible to file some forms electronically. For more information, see Introduction to E-Filing.

| Texas Service Center Direct Mail Address by Application | |
|---|---|
| **I-90 "B" and "D"** | **USCIS TSC**<br>**ATTN: I-90 "b" or "d"**<br>**P.O. Box 851983**<br>**Mesquite, TX 75185-1983** |
| **I-129 (Except I-129F)** | **Vermont ServiceCenter** |
| **I-129F, I-212, I-612, I-751, I-817 Family Services** | **USCIS TSC**<br>**P.O. Box 850965**<br>**Mesquite, TX 751185-0965** |
| **I-130** | **USCIS TSC**<br>**PO Box 850919**<br>**Mesquite, TX 75185-0919** |
| **I-131, I-102, Legalization, Residents** | **USCIS TSC**<br>**PO Box 851182**<br>**Mesquite, TX 75185-1182** |
| **I-131 E-Filed – Supporting Documentation** | **USCIS TSC**<br>**ATTN: E-Filed I-131**<br>**PO Box 852685**<br>**Mesquite, TX 75185-2685** |
| **I-526, I-829, EB/Business** | **USCIS TSC**<br>**PO Box 852135**<br>**Mesquite, TX 75185-2135** |
| **I-140 E-Filed – Supporting Documentation** | **USCIS TSC**<br>**ATTN: E-Filed I-140**<br>**PO Box 851391**<br>**Mesquite, TX 75185-1391Nebraska Service Center** |
| **I-360, I-526, I-829** | **USCIS TSC**<br>**PO Box 852135**<br>**Mesquite, TX 75185-2135** |
| **I-140**<br>**I-140/I-485 Concurrent Filing** | **Nebraska Service Center** |
| **Premium Processing** | **USCIS TSC**<br>**PO Box 279030**<br>**Dallas, TX 75227-9030** |
| **I-485** | **Nebraska Service Center** |
| **I-181, I-865 Adjustment** | **USCIS TSC**<br>**PO Box 851804**<br>**Mesquite, TX 75185-1804** |
| **I-539** | **USCIS TSC**<br>**PO Box 851182**<br>**Mesquite, TX 75185-1182** |
| **I-539 E-Filed – Supporting Documentation** | **USCIS TSC**<br>**ATTN: E-Filed I-539** |

| | PO Box 852523<br>Mesquite, TX 75185-2523 |
|---|---|
| I-589, I-213, FD258 | USCIS TSC<br>PO Box 851892<br>Mesquite, TX 75185-1892 |
| I-765 | USCIS TSC<br>PO Box 851041<br>Mesquite, TX 75185-1041 |
| I-765 E-Filed – Supporting<br>Documentation | USCIS TSC<br>ATTN: E-Filed I-765<br>PO Box 852401<br>Mesquite, TX 75185-2401 |
| I-824 | USCIS/TSC<br>PO Box 851182<br>Mesquite, TX 75185-1182 |
| N-400<br>Naturalization | USCIS TSC<br>PO Box 851204<br>Mesquite, TX 75185-1204 |
| RFE/I-72 Returns, All<br>Naturalization | USCIS TSC<br>PO Box 852381<br>Mesquite, TX 75185- 2381 |
| Motions and Appeals | USCIS TSC<br>PO Box 852841<br>Mesquite, TX 75185-2841 |
| Address and<br>Attorney Change<br>Notification | USCIS TSC<br>P.O. Box 850891<br>Mesquite, TX 75185-0891 |
| General<br>Correspondence | USCIS TSC<br>PO Box 851488<br>Mesquite, TX 75185-1488 |
| Courier Delivery | USCIS TSC<br>4141 St. Augustine Rd.<br>Dallas, TX 75227 |

| |
|---|
| **Note: Use the box number for the principal application if more than one application is concurrently submitted. For example, if an I-485 is submitted with an I-131, and I-765, the application should be mailed to the P.O. Box number for the I-485 application.** |
| **If you are submitting Form I-485, Form I-131 and/or Form I-765 with your Form I-140, please send the entire package to the P.O. Box listed for concurrent filings for Form I-140.** |
| **With exceptions noted above, separate P.O. Box numbers and Zip codes are required for the different form types.** |
| **If a case has been improperly rejected, you should resubmit by Double Bagging and indicate on the inner bag "DO NOT OPEN IN THE MAILROOM" . Mail to the Attention of Noel Watts, CPAU Supervisor.** |



**Contacting Us**

**" Age Outs" :**

"Age Out" cases involve the children of principal aliens or U.S. citizens. Sometimes, if these children turn 18 or 21 (depending on the type of benefit sought) before their case is processed, they will lose the benefit they are seeking. If your case falls within this category, please indicate on your application that it is an "Age Out" case.

Please note: The above statement may no longer apply to your individual case. On August 6, 2002, President Bush signed into law the Child Status Protection Act (CSPA). This law changes the "Age Out" rules in effect prior to signing of the CSPA which was were previously defined under the Immigration and Nationality Act (INA). Under the new law, a child will be prevented from "aging out" due to service processing delays.

Please read guidance here to see if the "Age Out" policy affects you or your children.

We ask that you bring age outs to our attention a minimum of six months before the 18th or 21st birthday depending on the type of benefit sought. We may not be able to complete dire circumstances age outs sooner than six weeks because of fingerprint processes and requirements, which mandate that FBI clearances be completed prior to adjudication.

**Change of Address:**

Customers with pending applications may report their change of address to Customer Service at 1 (800) 375-5283.

**You also need to file Form AR-11 in all cases of change of address.**

**Customer Feedback:**

We strive to provide quality service to our customers. If we have not lived up to this commitment, we would like to know. If we have met or exceeded your expectations, please let us know that as well. To comment on the services provided at this office, please write to the Center Director, at:

U.S. Citizenship and Immigration Services
Texas Service Center
P.O. Box 851488
Mesquite, TX 75185-1488

Note in the heading of the letter and on the envelope: " FOR THE PERSONAL ATTENTION OF THE DIRECTOR."

If you feel you were mistreated by a USCIS employee, or wish to make a complaint of misconduct by a USCIS employee, you may write to the Service Center Director, or write directly to the:

Director, Office of Internal Audit
425 Eye Street, NW
Room 3260
Washington, DC 20536

Please be specific and reference specific case numbers and dates to provide the best way for us to understand and assess your complaint.

**Designated Civil Surgeons:**

For general information on the required medical examination, please see "
Designated Civil Surgeons" . Most applicants for adjustment of status are
required to have a medical examination. A civil surgeon who has been
designated by USCIS must conduct the medical examination. See the
listing of Designated Civil Surgeons in your area. You may also call
Customer Service at 1 (800) 375-5283. You will be asked to provide your
zip code. Have a pen or pencil ready to write down the list of civil surgeons
in your area.

Doctors interested in being registered as a Designated Civil Surgeon in
should submit the following to the local District Office:

·          A letter to the District Director requesting consideration

·          A copy of a current medical license

·          A current resume that shows 4 years of professional experience,
not including a residency program

·          Proof of citizenship and lawful status

·          Two signature cards showing name typed and signature below

**Employment Opportunities:**

To obtain information about employment opportunities with USCIS,
please search the USA Jobs Website for current Department of
Homeland Security vacancy announcements.

**Employer-related Immigration Matters** (USCIS Office of Business
Liaison)**:**

CALL: 1 (800) 357-2099
TDD: 1 (800) 278-5732

**General Expedite Procedures**

Please call customer service at 1-800-375-5283 to discuss the criteria for
consideration of a request to expedite a case.

AILA members must process their requests through one of the AILA
Liaison Co Chairs.

Cases that are not clearly approvable will not be expedited. Requests to
expedite petitions or applications that are incomplete will not be granted.
All supporting documents not in English must include a certified translation.
See "Documents Not in English" on our National Service Center page.
There is no appeal of the denial of an expedite request. Please see our
USCIS Expedite Criteria guidance.

**Fee Waivers:**

Fee waivers are given at the sole discretion of the Center Director and
may be granted or denied on a case-by-case basis. Please direct
requests to the Center Director's attention and include all relevant
information with each request. Decisions will be based solely on the
supporting documents submitted.

**Forms:**

Forms are *not* available at the Texas Service Center. Forms are
available through the local USCIS offices, through the Government

Printing Office (GPO), at GPO bookstores, or call 1 (800) 870-3676 to have forms mailed to you. You can find USCIS forms online or make an on-line request that they be mailed to you.

### Freedom of Information Act (FOIA):

To submit a request for information pursuant to the Freedom of Information Act or Privacy Act, visit www.dhs.gov for instructions about how and where to send your request.

### Information:

Call Customer Service at 1 (800) 375-5283.

### LIFE Act

### National Customer Service Center:

Call Customer Service at 1 (800) 375-5283 for information and help on matters concerning immigration services and benefits.

### Naturalization Information:

In addition to the information provided on the TSC home page, please visit the Naturalization Website. Included on the site is information on who can be naturalized, what is required, how and where to apply, frequently asked questions, and *A Guide to Naturalization*, which provides an overview of the naturalization process. From that Website, you can access and download Naturalization Forms including Form N-400, Application for Naturalization.

### Processing Dates:

Processing time varies by case type. The projected processing time is included on each receipt notice (Form I-797) sent to applicants and petitioners. See also Processing Dates.

### Status of Applications Inquiries:

See Finding the Status of Your Case.

### Supplemental Information:

Notices for additional information or clarification mailed from the Service Center will contain a colored cover sheet to be used in responding to the notice.   In all cases, responses to a notice must include the colored copy of the notice on top of the response to ensure that the response is directed for review in a priority manner.

### Other Immigration Offices Serving This Area:

### Application Support Centers (ASCs) (where fingerprinting can be obtained):

For information, including directions, call Customer Service (800) 375-5283.

### List of USCIS Field Offices by State


*Top of the Page*

*Last Modified 07/27/2006*